Filed 12/23/20  In re M.J. CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re M.J., a Person Coming Under the Juvenile Court Law. _____ HUMAN SERVICES AGENCY, COUNTY OF VENTURA, Plaintiff and Respondent, v. T.H., Defendant and Appellant. | 2d Juv. No. B305763 (Super. Ct. No. J072332) (Ventura County) |

This dependency proceeding involves a mother who became convinced her daughter, M.J., who was born in March 2007, was seriously ill even though she has only minor health issues.  After M.J.'s doctors expressed concern about the number of unwarranted medical appointments and resultant school absences, Ventura County Human Services Agency (HSA) filed a

petition under Welfare and Institutions Code section 300, subdivision (b)(1)[1] seeking to declare M.J. a dependent of the juvenile court and to place her in her father's sole custody. Mother and father previously had joint custody.

Following a dispositional evidentiary hearing, the juvenile court sustained the petition, finding that M.J., who was 12 at the time, was at a substantial risk of serious physical harm or illness because of mother's failure or inability to provide appropriate care and support, and that mother has mental health issues that periodically interfere with her ability to provide adequate care and supervision. The court struck the allegation regarding mother's use of prescription drugs.

The juvenile court extended father's exclusive custody of M.J. and ordered mother's visitation to be supervised. It did give HSA discretion to liberalize mother's visitation to monitored or unsupervised.

Mother does not challenge the jurisdictional orders. She contends the dispositional orders placing M.J. in father's sole custody and requiring supervised visitation are not supported by substantial evidence. We affirm.

FACTUAL BACKGROUND

After receiving the dependency referral in September 2019, a social worker interviewed M.J., who said she had so many doctors' appointments in San Diego that she had to miss school and even started school later than the other students. Attendance records confirmed that M.J. missed over a full month of school between August 21 and September 24, 2019.

_____

[1] All statutory references are to the Welfare and Institutions Code.

M.J. had been seeing five different specialists in San Diego since 2017 because mother believed M.J.'s case was "too complex" to be treated locally. M.J. had appointments nearly every month at Rady's Children's Hospital in San Diego, and mother also drove her to medical appointments in Sacramento, Nevada City and Stanford.

M.J.'s physicians were troubled by the volume of, and the lack of need for, the medical appointments and hospital visits. For example, Dr. Gottschalk,[2] M.J.'s endocrinologist, had recommended that she not engage in contact sports due to low bone density and osteopenia, but M.J. did not require treatment and her osteopenia was not causing her any issues. Dr. Gottchalk and another doctor, Dr. Bacharach, noted that mother "focuses on her own illnesses," "[k]eeps pushing the idea that [M.J.] has the same disorder as [her] mother," and "constantly barrag[es] providers asking for things." Both doctors thought mother was "looking for something bad" and wanted her daughter to "have a medical problem."

Father also was concerned. He did not believe mother was intentionally trying to harm M.J., but he was worried about the number of medical appointments and mother's insistence that M.J. be seen by doctors in San Diego.

## DISCUSSION

### Standard of Review

To remove a child from parental custody, the juvenile court must find by clear and convincing evidence that there is a risk of substantial harm to the child if returned to the parent and that

---

[2] The record does not disclose the various doctors' first names.

there are no other reasonable means to protect the child's safety. (§ 361, subd. (c); *In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.) We review the court's custody determination for substantial evidence. (*Yolanda L.,* at p. 992.) We draw all reasonable inferences from the evidence to support the court's findings and do not reweigh the evidence or exercise our independent judgment. (*Ibid.*)

The juvenile court's order setting visitation terms is reviewed for abuse of discretion. (*In re Michael B.* (1992) 8 Cal.App.4th 1698, 1704.) Abuse of discretion is shown only if, under all of the evidence, viewed most favorably to the ruling, no reasonable judge could have made that ruling. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.)

*Custody*

To remove a child from parental custody, the juvenile court need not find that the parent presents a danger to the child. Nor must the child be actually harmed. Section 361, subdivision (c)'s focus "is on averting harm to the child." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917.)

Here, the trial court found that removal was appropriate because it was "concerned that if we allow mom to have unfettered access to [M.J.], she won't be able to stop herself from seeing something that's not there, taking her to another doctor." The court explained: "I don't think [mom] believes what I'm saying right now. I think . . . she doesn't believe . . . she's done anything wrong. And that concerns me, because, again, it's not just me that's saying it. It's not just the social worker. It's the doctors [who] have been treating her and [M.J.]"

M.J.'s doctors, including Drs. Gottchalk and Bacharach, agreed M.J. had minor ailments at most and expressed alarm at

4

mother's insistence that M.J. was quite ill. Although Dr. Samras, M.J.'s primary care physician, did not think M.J. was at risk of "imminent harm," he was concerned that she was seeing so many different doctors and that her care was "not . . . localized." He opined that mother has "undiagnosed psychological issues," which she has refused to address, and that the impact on M.J. "needs to be evaluated by psychiatry." Dr. Samras acknowledged that mother "[w]anted to have additional and additional and additional appointments which [he] disagreed with due to no medical indication."

Following a 2019 automobile accident involving mother and M.J., a physician at the UCLA Beverly Hills Clinic observed that mother displayed "some evidence of mild health related delusions and *multiple health related obsessions*." (Italics added.)

Dr. Wigby, a geneticist, told a public health nurse that while genetic testing revealed M.J. has a rare gene variance, there was "[n]o indication for pursuing additional genetic testing at this point" and recommended a follow up in one to two years. Mother asked Dr. Wigby about Hajdu-Cheney syndrome, but the doctor noted M.J.'s physical features are inconsistent with that rare condition. Dr. Wigby was "concerned about [mother's] seeking medical opinions from so many providers" and her "seeing care providers in multiple systems due to [the] challenge to understand all the recommendations for all the providers and [the] chance for repeat testing." Dr. Wigby "reinforced" that mother should go through M.J.'s primary care physician for future care.

Dr. Beck, an orthopedist at UCLA, reported that M.J. has a "mild" case of "knock knees," which is mainly a cosmetic issue. She noted, however, "the amount and volume of phone calls and

requests for referrals for a relatively healthy patient without serious concerns (like a heart defect or cancer patient) was . . . out of proportion" to the diagnosis.

As a result of all these medical appointments and tests, M.J. also began to believe she was ill. When mother brought M.J. to Shriner's Hospital for knee pain in 2018, M.J. expressed tenderness to palpation throughout her entire left lower extremity. There was no significant swelling, redness or bruising, and the doctors determined she was "demonstrating pain out of proportion for the examination."

M.J. told the social worker that her diagnoses mirror her mother's, and that they include kidney stones, stomach issues and bone disease. M.J. said that "she [has lived] with a lot of pain and discomfort all of her young life and if she could wish for one thing it is for all the pain to disappear so she can be a normal child."

By the time of the dispositional hearing, M.J. had been living exclusively with father for over three months. Her health improved in his custody. M.J. reported that except for pain in her legs, she had no other medical issues. Her school attendance also improved. She missed only one day due to illness.

We conclude substantial evidence supports the juvenile court's order awarding sole custody to father. As the court observed, "the evidence . . . does not support the unbelievable, overwhelming doctors' visits, hospital visits, traveling around the state that mom has subjected [M.J.] to. That doesn't mean mom isn't appropriately concerned, but there is an appropriate, reasonable way to address that without taking her out of school, driving her everywhere, leading her to believe that she's got these

serious medical conditions which no doctor has indicated she does at this point."

*Visitation*

In ordering reunification services, a juvenile court must provide for visitation between the parent and child as frequently as possible, "consistent with the well-being of the child." (§ 362.1, subd. (a)(1)(A).) The juvenile court has broad discretion to set the terms of visitation, based on what would serve the child's best interest. (*In re Neil D.* (2007) 155 Cal.App.4th 219, 224-225.)

Mother contends that substantial evidence does not support the juvenile court's visitation order. The correct standard of review, however, is abuse of discretion. (*In re Michael B.*, *supra*, 8 Cal.App.4th at p. 1704.) The People argue the court's order for supervised visits with mother, with discretion to HSA to liberalize visitation, was not an abuse of judicial discretion. We agree. As discussed above, the court noted that mother does not believe she has done anything wrong and that there is a risk, based on her history, that she "won't be able to stop herself from seeing something that's not there."

During one supervised visit before the dispositional hearing, mother "repeatedly" questioned M.J. about whether M.J. "had trouble seeing and having her vision being tested." The social worker had to redirect mother and return her focus to M.J.'s homework. Mother also told the social worker that she believed HSA staff was "calling her doctors and telling them to only offer her appointments when she has visits scheduled with M.J. to make it difficult for her to get medical care."

Under these circumstances, we cannot conclude that no reasonable judge could have made the same visitation order. (See *In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1351.) Indeed,

7

the order is particularly reasonable given HSA's discretion to relax the visitation restrictions if appropriate.

## DISPOSITION

The orders of the juvenile court are affirmed.

NOT TO BE PUBLISHED.


PERREN, J.

We concur:


GILBERT, P. J.


TANGEMAN, J.

Tari L. Cody, Judge

Superior Court County of Ventura

_____

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

Leroy Smith, County Counsel, and Joseph J. Randazzo, Assistant County Counsel, for Plaintiff and Respondent.